ORIGINAL
D+F
C/M
TIME A.M. _____

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------x
MICHAEL DANIELS,

           Petitioner,

-against-

MELVIN L. HOLLINS,

           Respondent.
----------------------------------------x

**MEMORANDUM & ORDER**
No. CV-02-4495 (FB)(LB)

*Appearances:*
*For the Petitioner:*
URSULA BENTELE, ESQ.
Brooklyn Law School
250 Joralemon Street
Brooklyn, NY 11201

*For the Respondent:*
ELLEN C. ABBOT, ESQ.
JOHN M. CASTELLANO, ESQ.
ANASTASIA SPANAKOS-ORFAN, ESQ.
JOHNNETTE TRAILL, ESQ.
Queens County District Atty's Office
125-01 Queens Blvd
Queens, NY 11415-1568

**BLOCK, Senior District Judge:**

        Petitioner, Michael Daniels ("Daniels"), seeks a writ of *habeas corpus* pursuant to 28 U.S.C. § 2254 following his conviction in New York Supreme Court, Queens County, on two counts of robbery in the first degree, two counts of assault and one count of robbery in the second degree. Daniels contends that (1) he was deprived of due process when the prosecutor failed to disclose impeachment material under *Brady v. Maryland*, 373 U.S. 84, 87 (1963); and (2) the foreman of the jury obtained extra-record information and shared it

1

with other members of the jury, in violation of his rights under the Sixth Amendment.[1]

Daniels raised both claims in a § 440.10 motion, which was denied by the New York Supreme Court, see People v. Daniels, No. 243-89 & 4387-92 (N.Y. Sup. Ct. Jan. 3, 2002), and fully exhausted his claims when the Appellate Division denied leave to appeal. See People v. Daniels, No. 1462-02 (2d Dep't Apr. 23, 2002).[2] For the reasons set forth below, Daniels's petition is denied.

Preliminarily, Respondent contends that the petition is barred by the one-year statute of limitations under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"). See 28 U.S.C. § 2244(d)(1). Generally, subject to certain exceptions not applicable here, the limitations period accrues from the date on which a petitioner's judgment becomes final. See 28 U.S.C. § 2244(d)(1)(A). Daniels's conviction became final on October 16, 1996;[3] however, his petition was not filed until July 31, 2002, well after

---

[1] Although Daniels presented numerous claims in his *habeas* petition, he has opted to pursue only these two claims. See Daniels's Mem. of Law at 1 ("Petitioner presented several claims in the original petition, but notified Respondent of his intention to amend his petition, and now pursues only two claims.").

[2] A claim is fully exhausted once the Appellate Division has denied leave to appeal the denial of a § 440.10 motion because further leave to the Court of Appeals is not available. See N.Y. Rules of Court, Court of Appeals, § 500.10(a).

[3] A judgment is deemed final when a petitioner's time to file a writ of certiorari to the United States Supreme Court expires, see Williams v. Artuz, 237 F.3d 147, 151 (2d Cir. 2001), which occurs 90 days after entry of judgment. See Sup. Ct. R. 13. The Appellate Division, Second Department affirmed Daniels's conviction on March 11, 1996, see People v. Daniels, 225 A.D.2d 632 (2d Dep't 1996), and the New York Court of Appeals denied his application for leave to appeal on July 16, 1996, see People v. Daniels, 88 N.Y.2d 965 (1996); thus, his conviction became final on October 16, 1996, upon the expiration of the 90-day period to seek a writ of certiorari.

October 16, 1997, the date on which the one-year limitations period expired. Thus, the petition is time-barred unless it is subject to statutory or equitable tolling.

The parties agree that the only tolling provision relevant to the present case is statutory tolling by a properly filed post-conviction challenge. *See* 28 U.S. § 2244(d)(2). Furthermore, the parties agree that the petition would be timely if the Court were to find, as Daniels contends, that (1) Daniels filed a *coram nobis* motion on January 2, 1997, and (2) the motion was still pending before the Appellate Division when he filed the instant petition.[4] Accordingly, Daniels provided the Court with, *inter alia*, (1) a copy of a letter dated January 9, 1997, purportedly from the Appellate Division, stating that his motion was "on motion calender for 2/7/97"; (2) copies of letters dated October 13, 1997, March 18, 1999, and January 5, 2000, that he allegedly submitted to the Appellate Division inquiring about the status of his motion; (3) a copy of a letter dated June 21, 2002, that he submitted to the Appellate Division generally inquiring "how long . . it takes for the Appellate Division . . . to respond to a [*coram nobis* motion]"; and (4) a letter dated August 5, 2002 to the Appellate Division, enclosing a copy of his motion dated January 2, 1997. However, the Respondent, who disputes that Daniels properly filed this motion, submitted an affidavit by James Edward Pelzer, Clerk of the Court of the Appellate Division,

---

[4] A properly filed *coram nobis* motion would toll the statute of limitations even where, as here, the issues raised in that motion were not raised on *habeas*. *See* 28 U.S.C. 2244(d)(2) ("The time during which a properly filed application for State post-conviction or other collateral review with respect to the pertinent judgment or claim is pending shall not be counted toward any period of limitation under this subsection.").

3

explaining that (1) the Appellate Division has no record of receiving Daniels's 1997 *coram nobis* motion or his October 1997, March 1999, or January 2000 letters; (2) the Appellate Division has no record of calendaring his motion, and (3) the January 9, 1997 letter purportedly from the Appellate Division was printed on the form that is typically used for general motions – not the form typically used for *coram nobis* motions – and was missing the docket number. *See* Aff. of James Edward Pelzer (Aug. 25, 2005).

In light of the affidavit from the Appellate Division, it appears that the Court could find – without having to hold a hearing – that Daniels never sent his petition to the Appellate Division, *see Davis v. Herbert*, 2002 WL 31474523 (E.D.N.Y. Nov. 01, 2002) ("The absence of the purported . . . letters in the Appellate Division's case file and from that court's docket entries compels a finding that [the petitioner] did not send them to the Appellate Division . . . ."). In any event, the petition is without merit.

## BACKGROUND

### A. Relevant Aspects of the Trial

Daniels was charged with assaulting Manuela Barbosa ("Barbosa") in the early morning on July 2, 1992. In his opening statement, defense counsel conceded that Barbosa had been assaulted but explained that the assault occurred as a result of a narcotics dispute between Barbosa and a group of unidentified males and that Daniels was merely an innocent bystander.

After opening statements, the prosecutor informed the trial judge and defense counsel that he had "run rap sheets in every conceivable way and found nothing" on

Barbosa. Tr. at 532; *see also* Tr. at 538 (reiterating that he had "run every rap sheet that [he] kn[e]w."). He noted that Barbosa had told him that "she was once arrested" but "that th[e] case was dismissed"; he further commented that the dismissal explained "why [there was] nothing on the rap sheet." *Id.* at 535.

## 1. Barbosa's Testimony

Barbosa testified that, as she was using a pay phone on the corner of 96th Street and 31st Avenue in Queens County, Daniels, in concert with an unidentified individual, repeatedly stabbed Barbosa with a knife, took a small amount of money from her pockets and fled when a patrol car approached. She further testified that she identified Daniels as one of the assailants when Barbosa and the two officers chased after the fleeing men.

On cross-examination, counsel for Daniels first asked Barbosa whether she had been arrested. The prosecutor immediately objected, but Barbosa answered "no" before the trial judge ruled on the objection. The trial judge sustained the objection and instructed the jury to ignore the question and answer.

Thereafter, Daniels's counsel vigorously questioned Barbosa about her prior drug use:

> Q: In your life until July 2nd, 1992, have you ever used cocaine?
>
> A: Maybe I did a month, but not in 1992, sir.
>
> Q: You may have used cocaine?

A: Yes, sir.

Q: You are not sure you used cocaine?

A: No. I'm not saying I'm not sure. I'm saying if I did it was eight months before, that was my past sir.

Q: You said if you did?

A: Yes, sir.

Q: Did you or did you not use cocaine?

A: Yes, sir.

* * *

Q: Do you remember telling a doctor at Elmhurst Hospital that you used cocaine and marijuana frequently until eight months before this?

A: Not frequently, sir, not that.

Q: So the doctor would be mistaken if you said you used it frequently?

A: Yes, sir, because it was not every day. I'm not a cocaine addict, sir.

* * *

Q: Have you smoked marijuana?

A: Yes, sir.

Q: When, how many times have you smoked marijuana?

A: Whenever I felt depressed, but I didn't feel depressed every day, sir.

* * *

Q: Ms. Barbosa, did you tell Dr. Ruiz of Elmhurst Hospital

6

>       that you used marijuana frequently?
>
> A:    Not frequently, sir.
>
> Q:    You didn't [t]ell him you used it frequently?
>
> A:    I didn't use marijuana every day, so it was not frequently.

Tr. at 750-53.

## 2. Police Officers' Testimony

Two police officers, Thomas Signa and Oscar Johnson, each testified that while on routine patrol they witnessed two men, one of whom was a black male wearing a denim jacket, assault Barbosa up against the phone booth on the corner of 96th Street and 31st Avenue. They explained that they had a good view of the man in the denim jacket because (1) the officers were in close range of the corner; (2) the corner was well-illuminated by the patrol car's headlights and street lights; and (3) when the patrol car approached the corner, the man turned towards the patrol car and froze for a few seconds before fleeing. They testified that the two men fled in opposite directions but that they gave chase after the man in the denim jacket and shortly thereafter they located him, later identified as Daniels, about 100 feet away from the corner where the assault occurred. They also testified that they observed markings on Daniels's clothing that appeared to be human blood; at that time, the prosecution also introduced into evidence the clothing that Daniels was wearing at the time of his arrest.[5]

---

[5] The trial judge permitted the trial witnesses to testify that markings on the clothing appeared to be human blood and permitted the clothing to be entered into

On cross-examination of the officers, the officers conceded that between the phone booth where the assault occurred and where they were positioned in the patrol car, there was a lamppost and a fire alarm, potentially obstructing their view of the men assaulting Barbosa.

### 3. Daniels's Testimony

Daniels testified that he was using the payphone when Barbosa approached him and asked him whether he was selling drugs. Daniels claimed that he then witnessed three or four other men approach Barbosa and demand their "stuff" back because what Barbosa had given them was not "money." Tr. at 926. He further testified that the men started to assault Barbosa, and that because he became frightened, he fled the corner and was arrested by the police officers shortly thereafter.

## B. Additional Background Relevant to the Claims Raised

### 1. *Brady* Claim

Following Daniels's conviction, a private investigator hired by Daniels obtained two Certificates of Disposition from the New York County Court Clerk's Office that revealed that Barbosa had twice pleaded guilty to charges of disorderly conduct – once using the alias Mary Cruz. According to the court records, Barbosa was arrested following allegations that she possessed marijuana.

The parties agree that the criminal history search conducted by the prosecutor

---

evidence, but excluded the lab analysis of the clothing as a sanction for the prosecution's delayed disclosure of the lab report. *See* Tr. at 508.

8

did not reveal these dispositions because Barbosa pleaded to a violation, causing the records to be sealed pursuant to N.Y. Crim. Pro. L. 160.55(1)(c). Daniels's private investigator was able to access the records because sealed court files are not removed from the public record. *See, e.g.*, Bob Port, *Lawyers Rip Release of "Sealed" Records*, N.Y. Daily News (July 22, 2003) ("State law requires police reports and fingerprint records to be sealed when criminal charges are reduced to minor, nonfingerprintable infractions. But judicial officials say that law does not apply to court files."); *People v. Arrellano*, 150 Misc. 2d 574, 580-81 (N.Y. Supr. Ct. Apr. 17, 1991).

When Daniels raised his contention that the prosecution failed to disclose these dispositions in violation of *Brady v. Maryland*, the state court ruled:

> The material submitted by the defendant in support of his claims with respect to the complainant's prior convictions, Certificates of Dispositions obtained by his private investigator through a search of court records, belie his claims that Brady material was withheld and that the convictions constituted newly-discovered evidence warranting a new trial. The Certificates show that the complainant was twice arrested for possession of small amounts of marijuana. However, they also show that one arrest was followed by a dismissal without a conviction, the other resulted in conviction of a violation only, and the records of both proceedings were sealed. Thus, even if the complainant could have been impeached with the one conviction for a petty offense, the conviction is not directly probative of defendant's guilt or innocence, and thus, is neither *Brady* material nor newly discovered evidence. I note that the complainant was impeached with both the facts underlying a similar arrest and her history of drug abuse.
>
> To the extent that the defendant asserts that the prosecutor improperly withheld the record of convictions, the prosecutor's inquiries to the appropriate records center would

not have revealed the sealed convictions. There is no
indication that the prosecutor knew of the convictions and,
hence, for the reason also, no *Brady* violation.

*Daniels*, No. 243-89 & 4387-92 at 4-5.

## 2. Juror Misconduct Claim

Daniels also contends that the jury foreman, Sean Williams ("Williams"), confessed that he had viewed extra-record information, which contributed to the jury's guilty verdict. According to Daniels, Williams, who happened to be employed at the same correctional facility in which Daniels was housed, informed Daniels that (1) following one of the police officer's testimony, Williams visited the crime scene to conduct his own investigation, and (2) Williams removed tape that had been placed on a piece of physical evidence – clothing that Daniels was wearing at the time of his arrest – that the jury was reviewing, which revealed the words, "Presence of Human Blood".

He filed an affidavit in which he repeated these allegations with the state court. The state court ruled:

> Defendant's claims with respect to the misconduct of the jury foreman are supported only by defendant's hearsay allegations, and, consequently, are insufficient to impeach the jury's verdict or warrant a hearing. Furthermore, the allegations are not specific enough, and, therefore, too speculative, to show prejudice to defendants rights.

*Daniels*, No. 243-89 & 4387-92 at 6 (citations omitted).

After Daniels raised this claim in his *habeas* petition, Magistrate Judge Bloom afforded Daniels an opportunity to conduct discovery, including an opportunity to depose

Williams. *See Daniels v. Hollins*, No. CV-02-4495 (E.D.N.Y. Mar. 8, 2005). At his deposition, Williams admitted having a brief interaction with Daniels – although he contends that it occurred at Daniels's behest – but denied visiting the crime scene, tampering with any piece of evidence or having told Daniels that he had done either. *See* Sean D. Williams Dep. Tr. at 27-30, 59-61 (Apr. 20, 2005). The only additional evidence submitted on Daniels's behalf was an affidavit by a member of his legal team, averring that Daniels had made the allegations set forth above to her as well.

In regard to the clothing, the prosecutor also arranged for Daniels's counsel to view the physical evidence. At the time of the viewing, there was neither tape nor the words "Presence of Human Blood" found on the clothing; instead, the only markings were two holes cut out of the fabric, the symbols, "TH," "Blank," and "B1" and some numbers, all stemming from the lab's analysis of the alleged blood stains. *See* Supp. Aff. of Anastasia Spanakos-Orfan (Sept. 20, 2005).

## DISCUSSION

### A. Standard of Review

Only federal issues may be raised on *habeas* review. *See* 28 U.S.C. § 2254(a); *Estelle v. McGuire*, 502 U.S. 62, 68 (1991). Pursuant to AEDPA, when a federal claim has been "adjudicated on the merits" by a state court, the state court's judgment is entitled to substantial deference. *See* 28 U.S.C. § 2254(d). "[A] state court adjudicates a state prisoner's federal claim on the merits when it (1) disposes of the claim on the merits, and (2) reduces its disposition to judgment." *Sellan v. Kuhlman*, 261 F.3d 303, 312 (2d Cir. 2001) (citations

and quotations omitted).

For claims "adjudicated on the merits," *habeas* relief may not be granted unless the state court decision (1) was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," or (2) was "based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d). A state court decision is "contrary to" clearly established federal law "if the state court applies a rule that contradicts the governing law set forth" in Supreme Court precedent or "if the state court confronts a set of facts that are materially indistinguishable from a decision of [the Supreme Court] and nevertheless arrives" at a different conclusion. *Williams v. Taylor*, 529 U.S. 362, 405-06 (2000). A state court decision involves an "unreasonable application" of clearly established federal law if it unreasonably applies Supreme Court precedent to the particular facts of a case. *See id.* at 409. This inquiry requires a court to "ask whether the state court's application of clearly established federal law was objectively unreasonable," not whether the application was erroneous or incorrect. *Id.* In that respect, the standard to be applied "falls somewhere between merely erroneous and unreasonable to all reasonable jurists." *Wade v. Mantello*, 333 F.3d 51, 57 (2d Cir. 2003) (quoting *Jones v. Stinson*, 229 F.3d 112, 119 (2d Cir. 2000)). However, the "increment [of incorrectness beyond error] need not be great; otherwise, habeas relief would be limited to state court decisions so far off the mark as to suggest judicial incompetence." *Eze v. Senkowski*, 321 F.3d 110, 125 (2d Cir. 2003) (quoting *Francis S. v. Stone*, 221 F.3d 100, 111 (2d Cir. 2000)).

## B. *Brady* Claim

*Brady v. Maryland* establishes that the Due Process Clause requires the prosecution to disclose evidence that is favorable to the accused. *See* 373 U.S. 84, 87 (1963). As the Supreme Court has explained, "[t]here are three components of a true *Brady* violation: [1] The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; [2] that evidence must have been suppressed by the State, either willfully or inadvertently; and [3] prejudice must have ensued." *Strickler v. Greene*, 527 U.S. 263, 281-82 (1999). The Respondent does not contest that Barbosa's two prior pleas to violations constituted impeachment evidence, *see People v. Dillon*, 157 A.D.2d 742 (2d Dep't 1990) (approving of impeaching a witness with a plea to a violation); thus, at issue here are only the second and third components.

## 1. Suppression

Evidence can be "suppressed" even when the prosecutor does not have actual knowledge of the evidence favorable to the accused, *see Strickler*, 527 U.S. at 280 (noting that evidence is "suppressed" even when it is "known only to police investigators and not to the prosecutor" (quoting *Kyles v. Whitley*, 514 U.S. 419, 438 (1995))); thus, "the individual prosecutor has a duty to learn of any favorable evidence known to others acting *on the government's behalf in the case*, including the police." *Strickler*, 527 U.S. at 282 (citing *Kyles*, 514 U.S. at 437) (emphasis added). The Supreme Court, however, has not clearly established the precise point at which government agents become agents acting on behalf of the prosecution. *See United States v. Zagari*, 111 F.3d 307, 320 n. 13 (2d Cir. 1997) ("The

extent to which knowledge may be imputed from one federal investigative agency to another for *Brady* purposes is as yet unclear."); *Smith v. Secretary of New Mexico Dep't of Corrections*, 50 F.3d 801, 825 n. 36 (10th Cir. 1995) ("In the absence of actual knowledge . . . the circuits are somewhat split as to the precise contours of when knowledge by an arm of the State will be imputed to the prosecution.").

For example, although numerous circuit courts have held that "prosecutors can 'suppress' evidence by failing to search for background information, such as a witness's criminal history, that is readily available through routine investigation of the prosecution's files or the files of other government agencies[,]" *Chandras v. McGinnis*, 2002 WL 31946711, at *7 (E.D.N.Y. Nov. 13, 2002) (citing *Crivins v. Roth*, 172 F.3d 991, 997-98 (7th Cir. 1999); *Hollman v. Wilson*, 158 F.3d 177, 181 (3d Cir. 1998); *United States v. Brooks*, 966 F.2d 1500, 1502 (D.C. Cir. 1992); *United States v. Auten*, 632 F.2d 478, 481 (5th Cir. 1980)), it is less clear whether a prosecutor has suppressed evidence where he or she has diligently searched criminal history records but nonetheless overlooked a prior conviction. *Compare Hollman v. Wilson*, 158 F.3d 177, 181 (3d Cir. 1998) (no *Brady* violation where prosecutor did not find record of conviction because a clerical error resulted in a witness being given two different criminal identification numbers); *United States v. Young*, 20 F.3d 758, 764 (7th Cir.1994) (no *Brady* violation where government diligently searched national and local files for information about witness's criminal history but failed to search records of other states), *with Crivins*, 172 F.3d at 997-98 (*Brady* violation where prosecutor failed to disclose witness's prior conviction under an alias despite that the conviction may not have been

easy to uncover). Accordingly, the Court cannot conclude that it is clearly established Supreme Court law that the prosecutor had a duty to seek out records that had been sealed and were not available from the general government database. *See Clark v. Portuondo*, 2002 WL 31553502 (S.D.N.Y. Nov. 13, 2002) (upholding Appellate Division's determination that the prosecutor's failure to disclose a sealed violation did not constitute a *Brady* violation because Supreme Court has yet to resolve circuit split). Therefore, the state court's ruling cannot be contrary to or an unreasonable application of clearly established Supreme Court law.

**2. Prejudice**

Even assuming *arguendo* that the prosecutor did suppress the violations, the Court also concludes that the state court's conclusion that there was no prejudice was not clearly contrary to or an unreasonable application of Supreme Court law. Preliminarily, the Court notes that the parties agree that the state court erred when it stated that one of the arrests was followed by a dismissal; however, that error is harmless.

Prejudice is shown where a defendant shows "that the evidence 'could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict.'" *United States v. Schwarz*, 259 F.3d 59, 64 (2d Cir. 2001) (quoting *Kyles*, 514 U.S. at 434-35); *see also Giglio*, 405 U.S. at 154 (requiring a new trial only if the impeaching evidence "could . . . in any reasonable likelihood have affected the judgment of the jury[.]" (quoting *Napue v. Illinois*, 360 U.S. 264, 271 (1959))).

"[E]vidence whose function is impeachment may be considered to be material

where the witness in question supplied the only evidence linking the defendant to the crime" or where the witness supplied the only evidence linking the defendant to "an essential element of the offense." *United States v. Avellino*, 136 F.3d 249, 256-57 (2d Cir. 1998) (citing *Giglio*, 405 U.S. at 154-55; other citations omitted). Daniels conceded that Barbosa had been assaulted but contested the identity of the individuals who committed the assault; therefore, the impeachment evidence could not have been material because two police officers, in addition to Barbosa, identified Daniels as one of the assailants.

Moreover, even where a witness's testimony is critical to the conviction, impeachment evidence is not material "where the undisclosed evidence merely furnishes an additional basis on which to challenge a witness whose credibility has already been shown to be questionable or who is subject to extensive attack by reason of other evidence . . . ." *Id.* at 257 (citations omitted). Because Barbosa had already been impeached with respect to her drug use, the very acts underlying the violations, the additional impeachment evidence does not undermine confidence in the verdict.

Daniels contends that the impeachment evidence, namely that Barbosa had used an alias and that she committed perjury when she falsely testified that she had not been arrested, would establish Barbosa's propensity for lying – not just for prior bad acts. Although the Court acknowledges that the evidence is not merely cumulative, *see Crivens*, 172 F.3d at 999 ("We believe the introduction of [the witness's] criminal history and his habit of lying to police and judges [by using an alias] could have affected his credibility in this case and, thus, may have led the state trial court to a different outcome."); *United States*

*v. Seijo*, 514 F.2d 1357, 1363 (2d Cir. 1975) (perjury is strong impeachment material), given the nature of Daniels's defense – based primarily on mistaken identity rather than fabrication – the impeachment evidence is simply not sufficient to undermine confidence in the verdict.

## C. Juror Misconduct

As the Second Circuit has explained:

> [A] criminal defendant's Sixth Amendment rights are implicated when a jury considers incriminating evidence that was not admitted at trial. A determination that a petitioner's Sixth Amendment rights have been violated by a jury's consideration of extra-record information is not sufficient to grant a writ of habeas corpus, however. The court must also determine beyond a reasonable doubt that this constitutional error was not harmless.

*Loliscio v. Goord*, 263 F.3d 178, 184 (2d Cir. 2001) (citations omitted). Typically, in analyzing these claims, to avoid the need for a hearing, the Court would "assume without deciding that a Sixth Amendment violation had occurred" and proceed "immediately to the harmless error determination[,]" *see id.* at 185; however, the Court need not follow the typical procedure because, as explained below, Daniels has not even met the threshold to warrant a hearing.

"The duty to investigate [i.e., hold a hearing] arises only when the party alleging misconduct makes an adequate showing of extrinsic influence to overcome the presumption of jury impartiality." *United States v. Ianniello*, 866 F.2d 540, 543 (2d Cir. 1989) (citation omitted). The Second Circuit has explained:

> [H]earings such as the one that [petitioner] request[s] should be avoided whenever possible. We are always reluctant to haul jurors in after they have reached a verdict in order to probe for potential instances of bias, misconduct or extraneous influences. As we have said before, post-verdict inquiries may lead to evil consequences: subjecting juries to harassment, inhibiting juryroom deliberation, burdening courts with meritless applications, increasing temptation for jury tampering and creating uncertainty in jury verdicts. This court has consistently refused to allow a defendant to investigate jurors merely to conduct a fishing expedition.

*Id.* at 543 (internal citations and quotations omitted).

Accordingly, a hearing would be warranted only if Williams submitted affidavits on behalf of himself or others containing "assertions of fact that [the affiant] is in a position to establish by competent evidence." *United States v. Aiello*, 814 F.2d 109, 113-14 (2d Cir. 1987). "Airy generalities, conclusory assertions and hearsay statements will not suffice because none of these would be admissible evidence at a hearing." *Id.*; *see also Locascio v. United States*, 395 F.3d 51, 57 (2d Cir. 2005). Unlike the cases cited by Daniels, where the petitioner submitted affidavits by jurors or other witnesses who could testify about particular juror misconduct that they had directly witnessed, *see Smith v. Phillips*, 455 U.S. 209, 215 (1982); *United States v. Schwarz*, 283 F.3d 76, 98 (2d Cir. 2002); *Church v. Sullivan*, 942 F.2d 1501, 1508 (10th Cir. 1991); *United States v. Ianniello*, 866 F.2d 540 (2d Cir. 1989); *DeLucia v. McMann*, 373 F.2d 759, 762 (2d Cir. 1967), Daniels has only presented hearsay evidence. Thus, because Daniels has not presented any competent evidence, the Court concludes that the state court's denial of his claim without an evidentiary hearing was not contrary to or an unreasonable application of clearly established Supreme Court

law.

## CONCLUSION

The petition is denied. A certificate of appealability will not issue because Daniels has failed to make a substantial showing of the denial of a federal right. *See* 28 U.S.C. § 2253.

**SO ORDERED.**

                                                   FREDERIC BLOCK
                                                   United States Senior District Judge

Dated:      Brooklyn, New York
              January 9, 2006